In the Matter of the Arbitration Between
---
U.S. Airline Pilots Association (USAPA)

and                                            Transition Dispute #10

U.S. Airways
---
Hearings held March 10-11, April 9-10, 2009
Before the System Board of Adjustment
Richard I. Bloch, Esq., Chairman
Mitchell A. Vasin, Association Appointed Member
John Brookman, Association Appointed Member
Linda Malone, Company Appointed Member
Paul Jones, Company Appointed Member

APPEARANCES

<u>For the Association</u>
Sue Edwards, Esq.
Aliki Recklitis, Esq.

<u>For the Company</u>
Robert A. Siegel, Esq.
Aparna B. Joshi, Esq.

OPINION

Facts

      The 2005 Transition Agreement ("TA") between these parties includes a job preservation provision that specifies both the minimum number of aircraft to be maintained by U.S. Airways ("East") and by America West ("West") and, significant to this case, a minimum utilization rate for the aircraft, which currently is 8.79 hours per day on the East, and 9.87 hours per day on the West.[1]

---

[1] Co. Exhs. 10,11; U. Exhs. 5,14, 15.

The minimum utilization requirement is at issue in this case. USAPA claims the Company has failed to meet the 9.87-hour minimum in the West fleet during September, October, November and December of 2008. By the Company's calculation, however, there has been no violation.[2] The parties were unable to resolve the dispute and, accordingly, submitted it for resolution to the System Board of Adjustment, which conducted hearings on March 9 and 10, after which written closing arguments were submitted.

Issue

Did the Company violate Section II.B.4.c. and Section II.B.4.d. of the Transition Agreement by failing to maintain the required utilization rate? If so, what is the appropriate remedy?

Association Position

USAPA maintains the daily utilization rate must be calculated each month, based on the average daily hours per day the West aircraft had been flown during that particular month. To the extent the rate, calculated in that manner, dips below 9.87 hours in any given month, the Company is in violation of the agreement.

USAPA requests that the Board order the Company to calculate compliance in this manner (which, without dispute, would yield averages below 9.87 for the months at issue.) The issue of damages should be remanded to the parties, with the Board retaining jurisdiction in the event of a dispute.

---

[2] See Co. Exhs. 10 and 11.

Management Position

The Company agrees with the 9.87 hour threshold. It agrees, as well, the calculation must be performed each month. But, says the Company, the appropriate time period to be scrutinized each month is a rolling average based on the previous twelve months. By this calculation, says the Company, it is in compliance. The Company requests the grievance be denied.

Relevant Contract Provisions

2002 RESTRUCTURING AGREEMENT

Definition of US Airways Active Fleet: The aircraft in the then-current US Airways permanent bid plus 8% for maintenance and spares, with a minimum average daily utilization rate (measured on a monthly basis) of 10 hours measured by aircraft in the permanent bid of US Airways.

Minimum Active Fleet: No less than 275 aircraft (including permanent bid plus 8% for maintenance and spares), with daily utilization rate measured monthly of 10 hours. In the event of Chapter 11, the minimum active fleet may be no less than 245 (permanent bid plus 8% for active spares).

LETTER OF AGREEMENT 84, ATTACHMENT A

Minimum Aircraft: As a condition of implementing and maintaining any of the Productivity Improvements, the Minimum Active Fleet specified in Attachment E of the Restructuring Agreement shall be increased to 279 aircraft (excluding SJs but including permanent bid plus 8% for active spares) with daily utilization rate measured monthly of no less than 10 hours, whether or not the Company is in Chapter 11. The Minimum Active Fleet number may be reduced only as made necessary by a new force majeure event, which includes acts of terrorism with a material adverse impact on commercial aviation.

## LETTER OF AGREEMENT 93

Minimum Aircraft: If the Company is under Chapter 11 bankruptcy protection during the duration of this Agreement, the provisions of the July 2002 Restructuring Agreement as amended by Letter of Agreement #84 regarding Minimum Aircraft (including the daily utilization rate measured monthly) will not apply during the pendency of such Chapter 11 case, and the number of minimum aircraft will be re-established one year after the implementation of a confirmed plan of reorganization in such Chapter 11 case at the lesser of: (x) 279 total aircraft (excluding SJs), or (y) the number of total aircraft then operated by the Company (excluding SJs) less ten percent (10%), rounded to the nearest aircraft. The daily utilization rate measured monthly will be re-established one year after the implementation of a confirmed plan of reorganization in such Chapter 11 case at the average daily utilization rate for the prior twelve months less ten percent (10%). The Association further agrees that the provision regarding Minimum Block Hours of the July 2002 Restructuring Agreement as amended by Letter of Agreement #84 will be eliminated. Other productivity provisions of Letter of Agreement #84 contingent on such Minimum Aircraft and Minimum Bloch Hour provisions will remain in full force and effect as amended by the Agreement as if such provisions were satisfied.

## TRANSITION AGREEMENT SECTION II.B.4.C

(c)  For US Airways, the number of minimum aircraft will be re-established one year after the consummation of the Merger Agreement at the lesser of 279 total aircraft (excluding SJs), or the number of total aircraft then operated by US Airways (excluding SJs) less ten percent (10%), rounded to the nearest aircraft, with the daily utilization rate measured monthly as the average daily utilization rate for the prior twelve months less ten percent (10%)

(d)  For America West, the number of minimum aircraft will be established one year after the consummation of the Merger Agreement at the lesser of 140 total aircraft (excluding SJs) or the number of total aircraft then operated by America West (excluding SJs) less ten percent (10%), rounded to the nearest aircraft with the daily utilization rate measured monthly as the average daily utilization rate for the prior twelve months less ten percent (10%)

Analysis

The contested language at issue resists easy analysis; it is not happily drafted. Having carefully reviewed the evidence and arguments, however, the Board concludes, for the reasons that follow, that this grievance has merit. One may accept the Company's contention that, in re-drafting the original minimum utilization language, it intended to incorporate a "rolling 12-month average." However, the record is unclear as to whether that approach was clearly communicated to USAPA during bargaining. More importantly, such mechanism is nowhere recited in the TA's version of the minimum utilization language.

One begins with the germinal language found in the 2002 Restructuring Agreement.

2002 RESTRUCTURING AGREEMENT

Definition of US Airways Active Fleet: The aircraft in the then-current US Airways permanent bid plus 8% for maintenance and spares, *with a minimum average daily utilization rate (measured on a monthly basis) of 10 hours measured by aircraft in the permanent bid of US Airways.* (Italics added.)

Minimum Active Fleet: No less than 275 aircraft (including permanent bid plus 8% for maintenance and spares), *with daily utilization rate measured monthly of 10 hours.* In the event of Chapter 11, the minimum active fleet may be no less than 245 (permanent bid plus 8% for active spares). (Italics added.)

These terms are relatively straightforward. By specifying "a minimum average utilization rate (measured on a monthly basis) of ten hours..." the parties accomplished two things, both successfully communicated in the language. First, it is reasonably clear from the text (and the parties agree) that utilization in a given month will be determined monthly by reference to utilization *that* month. Secondly, that average is to be compared against a constant minimum threshold (hereinafter, occasionally, "comparator") of ten hours.

That same concept, with essentially the same language was repeated six months later, also in 2002, in LOA #84.

### LETTER OF AGREEMENT 84, ATTACHMENT A

Minimum Aircraft: As a condition of implementing and maintaining any of the Productivity Improvements, the Minimum Active Fleet specified in Attachment E of the Restructuring Agreement shall be increased to 279 aircraft (excluding SJs but including permanent bid plus 8% for active spares) *with daily utilization rate measured monthly of no less than 10 hours, whether or not the Company is in Chapter 11*. The Minimum Active Fleet number may be reduced only as made necessary by a new force majeure event, which includes acts of terrorism with a material adverse impact on commercial aviation. (Italics added.)

Here again, the parties agree the language did double duty, establishing both the comparison threshold and the scrutiny of an individual month's performance.

In the summer of 2004, following the Company's emergence from its first bankruptcy, the parties began discussions on an agreement devoted largely to

concessions involving pay and benefit reductions, productivity adjustments and other similar items.[3] As part of that pursuit, the Company proposed abolishing the minimum utilization requirement, contending, among other things, that with the bankruptcy and uncertainties attending reorganization, it could not commit to thresholds of that nature. ALPA, the bargaining agent at that point, continued to press for extending the status quo by continuing the minimum utilization requirement.[4] Ultimately, on September 30, a compromise was reached. The Company presented language, in LOA #93, it believed would provide sufficient flexibility to allow continuation of a minimum utilization mechanism.

### LETTER OF AGREEMENT 93

Minimum Aircraft: If the Company in under Chapter 11 bankruptcy protection during the duration of the Agreement, the provisions of the July 2002 Restructuring Agreement as amended by Letter of Agreement #84 regarding Minimum Aircraft (including the daily utilization rate measured monthly will not apply during the pendency of such Chapter 11 case, and the number of minimum aircraft will be re-established one year after the implementation of a confirmed plan of reorganization in such Chapter 11 case at the lesser of: (x) 279 total aircraft (excluding SJs), or (y) the number of total aircraft then operated y the Company (excluding SJs) less ten percent (10%), rounded to the nearest aircraft. *The daily utilization rate measured monthly will be re-established one year after the implementation of a confirmed plan of reorganization in such Chapter 11 case at the average daily utilization rate for the prior twelve months less ten percent (10%).* The association further agrees that the provision regarding Minimum Block Hours of the July 2002 Restructuring Agreement as amended by Letter of Agreement #84 will be eliminated. Other productivity provisions of Letter of Agreement #84 contingent on such Minimum Aircraft and Minimum Block Hour provisions will remain in full force and effect as amended by this Agreement as if such provisions were satisfied. (Italics added.)

---

[3] Tr., p. 216.
[4] See Tr., p. 124, 127, Co. Ex. 3 at 114, Co. Ex. 4 at 17.

This language incorporated several "buffers" designed to provide some relief to the Company. The minimum utilization requirement was suspended until a year after the Chapter 11 reorganization plan had been implemented. And, when re-installed, the comparator for utilization was to be calculated by averaging the daily utilization rate over that twelve months, less ten percent. However, the Company claims the language did more: Monthly measurement, it says, was to be accomplished not by looking solely to a given month, as in the past, but by averaging the prior twelve months' daily utilization history.

Several observations are in order with respect to this language. First, there is no reason to quarrel with the Company's contention that such an approach would have been responsive to the monthly uncertainties (weather, mechanical issues, seasonal flying preferences, for example),[5] that can impact daily utilization. Nor does one question Company chief negotiator Bruce Ashby's assertion that minimum utilization rates were depriving the Company of adequate flexibility[6] and that merely changing the old 10% comparator "didn't really fix much."[7] In the overall, one may accept the Company's representation it

---

[5] See Tr., p. 247.
[6] Tr., p. 227.
[7] Tr., p. 249. Ashby stated: "The issue here was not what the line we were comparing to was, it was what we were comparing to it. And the issue we had was this sort of highly variable jumping up and down from month to month that had us concerned." Id.

"wasn't happy with the way the old language was worded...that the variation in months can be fairly large and the Company can go out of compliance."[8]

The problem for a reader, however, is that the words don't convey the critical message that the parties jointly intended to effect a massive change to the previously accepted meaning of "measured monthly". There is, simply stated, no language in either LOA #93 or in the subsequent TA that in any way suggests a twelve month rolling review for purposes of monthly measurement.

Conceding there is no direct definition of the phrase "measured monthly,"[9] the Company maintains the new concept was, nevertheless, expressly aired and discussed with the union chief negotiators. But the evidence falls far short of demonstrating communication of a nature that would allow one to infer such a change to language that is totally silent on the subject. Mr. Ashby candidly concedes the parties were, in September of 2004, in a "burning hurry" to get a deal done,[10] that he and his committee drafted the language at issue after explaining the concept to ALPA:

> I said we will be willing to look at it differently if you will look at it a little differently and do a different kind of calculation in which we'll go a longer period, and reset the measurement.
> So can we look at say a 12-month average instead of looking at each month, and set the number for the baseline that we compare against at 10 percent less than what we exited with.
> Mike Abram said that sounds okay. Write it up, and we'll look at it.
> It was a short discussion.[11]

---

[8] Tr., p. 243.
[9] Closing brief, p. 2.
[10] Tr., p. 242.
[11] Tr., p. 244.

Ashby testifies ALPA "definitely consented"[12] to the concept. But given the cryptic, and very hurried discourse -- it was, according to the witness, a "minute or so of conversation[13]"-- there is no reason to conclude that the precise scope of the extensive modification had been discussed, understood, or agreed to. Surely, (and significantly) the written language provides no support for the proposed modification.[14]

In sum, we conclude, for the reasons set forth above, that the language at issue does not incorporate the premise here urged by the Company -- that monthly measurements may be effected by considering a 12 month rolling average. The rolling twelve month review, however reasonable and responsive to the challenges confronting the Company, was, to these parties, a novel and arcane concept. If the previously understood, and relatively straightforward meaning of "measured monthly" were to be modified in this fashion, it was incumbent on the bargaining parties to make the change in considerably more explicit detail. In the absence of any such language, USAPA's claim that "measured monthly" meant the same, in LOA #93 and in the TA, as it had always meant to the bargaining parties is forceful and ultimately controlling. For these reasons, the grievance will be granted.

---

[12] *Id.*

[13] Tr.,p.246.

[14] In 2005, the parties began negotiations with ALPA for the Transition Agreement, in preparation for the US Airways/America West merger. TA Sections II.B.4.c and II.B.4.d were adopted by the parties. According to the record, there was no discussion of minimum utilization. (Tr.,pp.138,142,260.)

## AWARD

The grievance is granted. The Company violated the Transition Agreement by utilizing a 12-month rolling average instead of measuring on a month by month basis, as it had in the past. The matter is remanded to the parties for consideration of appropriate remedies. The System Board of Adjustment will maintain jurisdiction in the event of a dispute arising on the question of remedy.

_____
Richard I. Bloch, Esq., Chairman

_____  concur
Mitchell A. Vasin, Association Appointed Member

_____  concur
John Brookman, Association Appointed Member

_____  (Dissent)
Linda Malone, Company Appointed Member

_____  — DISSENT
Paul Jones, Company Appointed Member

October 16, 2009