In the Matter of the Arbitration Between

---

U.S. Airline Pilots Association
(USAPA)
        And                        Re: Transition Agreement No. 10
                                            Remedy –Supplementary Opinion

U.S. Airways, Inc.

---

Hearings held April 27 and September 13, 2011

<u>Before the System Board of Adjustment</u>
Richard I. Bloch, Esq., Chair
Paul DiOrio, Union-Appointed Member
John Brookman, Union-Appointed Member
E. Allen Hemenway, Company-Appointed Member
Paul D. Jones, Company-Appointed Member

APPEARANCES

<u>For the Association</u>
Sue Edwards, Esq.

<u>For the Company</u>
Robert A. Siegel, Esq.

                                            OPINION

<u>Facts</u>

       In 2009, the System Board of Adjustment considered a case involving minimum utilization rates for aircraft, the Association claiming the Company had failed to meet the flying threshold requirement in the West fleet during the latter portion of 2008. On October 16, 2009, the Board ruled the Company had violated the terms of an existing Transition Agreement by the manner in which it calculated utilization requirements. At that time, the matter was remanded to the

parties for consideration of appropriate remedies. The Board retained jurisdiction of disputes arising over the question of remedy. The parties were unable to reach agreement, and they brought that dispute before the Board in February of 2010. At that time, USAPA maintained the Company's violations were the result of premature lay-offs and inadequate staffing levels. As remedy, it requested that pilots prematurely furloughed be made whole for losses incurred and that the Company be required to recall 51 additional pilots to the work rolls.

Following a meeting in executive session, the System Board ruled the violations resulted not from inadequate staffing, but rather as a result of the Company's having wrongly calculated required minimum flying levels. The Board stated, in part:

> Viewed from another perspective, the Union's proposed remedy fails to satisfy some underlying assumptions concerning make-whole remedies. The well-accepted view is that remedies for contract breaches are to be compensatory rather than punitive. Otherwise stated, the goal is to put an injured party in the position it would have been had the breach not occurred. If one turns the clock back on the scenario at hand, it is clear enough that, had the Company calculated properly in any of the breach months, the result would have been to assign more flying to reserve pilots, rather than recalling pilots from furlough or delaying scheduled furloughs of others.[1]

So holding, the Board held that "the injured parties in this case were reserve pilots who would have been assigned extra block hours during the periods in question. The Company's proposed remedy, recalculating *those* pilots' pay with the assumption of more block hours, is the appropriate relief in this case and

---

[1] *U.S. Airways, Inc. and USAPA*, June 1, 2010, p. 3.

is hereby ordered."[2] The matter was remanded to the parties for purposes of implementing the remedy.

The Company and USAPA, however, were not able to agree either on the extent of damages or the appropriate manner in which monies should be distributed. For these reasons, the dispute was once more placed before the System Board. Following two days of presentations of documentary and testimonial evidence in Washington, DC, the Board met in executive session to review the record and prepare its response.

In accordance with the Board's previous observation that "had the Company wished to fly more . . . hours in the month, it had only to increase flying time for reserve pilots . . .", both parties have constructed models for distributing the additional flight time among reserves, a scenario that involves hypothetically "converting" reserves to lineholders. Once one determines the required number of converted reserves, (the major point of contention in this case), and identifies the particular pilots who would convert to lineholder status, the remedy consists of multiplying each affected pilot's pay rate by the number of hours required to reach the average lineholder credit hours for a given violation month.

Both parties seek to reconstruct, as far as possible, the events occurring during the violation months and to distribute the required number of additional flight hours accordingly. They part ways, however, on the assumptions made in constructing their respective models. The Union looks to the manner in which

---

[2] *Id.*, p.4.

flights were actually assigned during the months in question, basing the allocation of extra pilot block hours on the recorded utilization of aircraft and assignment of personnel.[3] The Union's remedy calculation begins, therefore, by distributing the violation hours to equipment and bases in the same "pro rata" percentages that had existed during the time at issue. Thus, if a particular base received twenty percent of the flying at the time, the Union allocates to that location an equivalent percentage of makeup hours for purposes of calculating the remedy. Based on that distribution, the Union then converts reserve pilots to lineholders and assigns those pilots additional block hours until the full quantum of "violation hours" is absorbed.[4] Significantly, however, in the conversion process, the Union counts the pilot's reserve flying as part of the total lineholder hours, thereby absorbing outstanding violations hours by only the difference between the reserve hours and the new lineholder time.

The Company's proposed methodology reconstructs the assignment process from scratch. Had the Company recognized, at the time, the necessity of assigning more flight time, it claims, it would have done so in the most cost-efficient manner. This would have generated a far different pattern during the violation months than that actually flown or adopted here by the Union, says the

---

[3] In that manner, says the Union, one can avoid windfalls to reserves who had, in fact, received assignments and who, most likely, would not have received extra flying while, at the same time, ensuring that reserves who should have flown more would receive appropriate compensation.

[4] Tr., pp. 8-10. The Union calculates the Company flew 16,364 aircraft hours less than required. This figure is not in dispute. The Union translates this to 33,316 pilot hours: Each aircraft block hour requires one Captain, but, as actually scheduled, some equipment combinations require more than one First Officer. When taking into account synthetic time, the Union calculates that, to be in compliance, the Company would have had to pay pilots an additional 10,997 credit hours.

Company. Under the Company's model, each converted reserve is credited with the full bank of average lineholder credit hours in a violation month, without regard to hours actually flown as a reserve, and the violation hour total is reduced accordingly. The reserve hours actually flown by those converted reserves are distributed to additional reserves.[5] This method, the Company urges, accurately projects what would have been done had the Company correctly scheduled the violation months with required levels of flying.[6]

The differing methods of allocating, thereby "absorbing", the extra flight hours account for a substantial difference, ultimately, in the respective monetary calculations. By limiting the reduction in violation hours to the difference between average lineholder credit hours in a given month and the reserve hours originally flown by the converted pilot[7], the Union calculus reduces the absorbed violation hours at a lower rate than the Company's method and, accordingly, requires more reserves than does the Company to absorb the balance. The Company's approach, on the other hand, wipes the slate clean by assuming all assignable hours of a given reserve would be available and unused. It also assumes the hours actually flown by the reserves could be assigned to, and absorbed by, remaining reserves without exceeding their credit hour meet-guarantee limit. By this method, more violation hours would be absorbed by the

---

[5] Those reserves would therefore have flown more in this model than they actually did, says the Company. Initially, the Company claimed the total hours would remain well below the meet-guarantee ceiling. That assertion was revised later in the proceedings, however. See discussion, *infra*, p. 9 *et seq*.
[6] Tr., p. 27.
[7] Time spent on vacation or utilized as sick time would also be added to this total.

converted pilots, with fewer hours distributed to reserves and, consequently, fewer reserves being necessary to absorb the extra flight time. Initially, the Company projected the use of some 521 converted reserves for the violation months and a total of about $550,000 in makeup pay.[8] USAPA, on the other hand, calculated the need for about 500 lineholders, with an additional 700+ reserves, amounting to about $1.2 million in damages.

Analysis

In constructing a responsive remedy in this case, the question to be addressed is: What would have happened had there been no breach? Making pilots whole for losses incurred as a result of the violation in this case proceeds, ideally, by reconstructing flight assignments during the time in question, thereby attempting, to whatever extent possible, to answer the question of how flight time would have been assigned, under the circumstances. Attempting to achieve any degree of accuracy is a daunting task which, in the judgment of the Board, neither party has completely achieved. Our analysis, therefore, relies on what we find to be the strong and reliable portions of each side's model, a process that ultimately leads to a damage figure that, we conclude, most closely approximates the losses suffered by affected pilots.

Several points are not in dispute. First, one needs to approximate the number of reserve pilots needed to be converted to lineholders during the violation months. While the parties differ on the precise number, they both agree

---

[8] The Company's recalculation added 197 pilots breaking meet guarantee at a cost of $242,000. See Co. Ex. 3, pp. 3, 5, and discussion *infra*, p. 10.

this is an essential step. Secondly, once the number of converted reserves is determined, and the pilots to be converted are identified[9] the rest is relatively straightforward: As indicated earlier, one simply multiplies affected pilots' pay rates by the number of hours needed to raise each of them to the average lineholder credit hours for the violation month.[10]

As indicated, the single largest factor separating the parties, accounting for some 80 percent of the differential in the remedy proposals, is the number of reserves to be converted to lineholder under the respective models. The Company's adjusted calculations[11] of 718 (521 converted reserves plus 197 reserves who break guarantee)[12] generates a revised total make-whole award of approximately $790,000. The Union, for its part, projects some 500 lineholders, but postulates an additional 700 reserves who would have broken guarantee, leading to its damage estimate of about 1.2 million dollars.

The parties' respective approaches diverge in a variety of manners. For our purposes, however, it suffices to highlight the most prominent. USAPA observes, correctly, that it is virtually impossible to recreate the assignment process with anything approaching 100 percent accuracy. Accordingly, it proposes that one refer to the actual assignment history of the months in

---

[9] The parties agree one must identify these individuals, but they have provided the Board no clear process for doing so.
[10] The total resulting wage differential must then be adjusted by an additional 10 percent to account for defined pension contribution payments that would have been made.
[11] At the commencement of the hearings, the Company projected a total of 541 converted reserves for the violation months. (See Tr., p. 26, but see Co. Ex. 3, p. 3, which lists the total as 521.) Testimony by the Union's witness, Rikk Salamet, however, led the Company to adjust that total to 718.
[12] See Co. Ex. 3.

question, as discussed earlier. This "pro rata" approach distributes the extra required block hours[13] among bases and equipment, by seat, in the same percentage assignments were actually made during the violation months. The Company argues, on the other hand, that, had it been faced with the necessity of distributing the extra hours, it would have done so in a manner that avoided assignment of time that was, by definition, "sub-marginal,"[14] either to locations where there were insufficient pilots or where the flying would be assumed by the largest and most expensive aircraft types. These approaches, however divergent, account for a relatively small portion of the damage calculations.[15]

The major dichotomy arises from the respective assumptions surrounding assignment of converted reserves. It is here the parties adopt dramatically different mechanisms for allocating the mass of violation hours. Specifically, the dispute centers on handling hours a converted reserve may have already flown (or have been credited with) in a given violation month.

The following example, admittedly highly simplified, will nevertheless illustrate the diverse methodologies. Assume, for purposes of discussion, that lineholders in a given month fly an average of sixty hours and that, therefore, it is necessary, for purposes of reconstruction, to assume a converted reserve would have flown those same hours, as well. Assume further that one needs to

---

[13] As noted earlier, these amount to some 10,000, without dispute.
[14] There is no real question the Company makes monthly decisions as to the most profitable use of available staff and equipment. It chose, (improperly, as it turns out) not to fly the time here at issue. Without question, however, this was because that flying was regarded, at that time, as unprofitable.
[15] According to the record, the parties differ by less than 10% on this point.

distribute, and thereby "absorb", 120 violation hours. Finally, assume, for ease of calculation, that every converted reserve pilot had flown 40 hours prior to the conversion to lineholder. The Union absorbs the violation hours by assigning 20 per reserve (thus bringing them to the 60 block hour average). By this approach, 6 converted reserves are necessary to account for the 120 violation hours.

The Company, for its part, starting from the "blank slate" referred to earlier, initially disregards any hours the pilot would have flown on reserve, instead assigning that pilot (now converted to lineholder) a full 60 hours of flying. Arithmetically, 2 lineholders would be necessary to account for the violation time by this method. As the Union notes, the hypothetical 40 hours each flown on reserve by the two converted reserves would have to have been flown by someone. It is here that both parties overreach, at least in their initial positions. The Company, for its part, maintained at the start of the hearing that *all* such time would have been readily accommodated within other reserves' unused meet-guarantee time. The Union, citing the impossibility of accurately researching and recording those statistics, assumes *none* of such hours would have been utilized (and thereby charged against the outstanding bank of violation hours). As a result, says the Union, the full bank of remaining hours would have been absorbed by remaining reserves, all of whom would break guarantee and thereby add to the cost of the remedy, due to increased premium flight hour

payments.[16] This aspect of the Union's model is unpersuasive. However challenging the task of reconstructing the reassignment scenario, there is no evidence that leads to the conclusion that every remaining reserve would break guarantee.

In the final analysis, then as indicated earlier, we find that a reasonable response to the difficult task of projecting damages is best served by adopting a mix of the methods suggested by the parties. We find the Company's overall approach to converting reserves to lineholders to be the more reasonable; the Union's proposal that additional hours would have been assigned "pro rata", as detailed above, is, in the final analysis, not compelling. At the same time, the Union's evidence[17] leads convincingly to the conclusion that substantial numbers of unconverted reserves would likely break guarantee, thus triggering additional cost. The Company concedes this point, estimating an additional cost burden of some $240,000,[18] but it claims the number of such pilots is far fewer than the Union assumes.[19] There is, however, no reason to assume that the Company's analysis has necessarily accounted for all pilots who would break guarantee. Both sides acknowledge that the substantial number of variables involved in attempting to replicate the flight assignments makes this process markedly

---

[16] The USAPA calculations reflect a total of 521 pilots converted to lineholders, with an additional 718 (total 1239) absorbing the remaining violation hours, but, significantly, all of whom are assumed to have broken guarantee.

[17] See Un. Ex. 12 and testimony of Rikk Salamat.

[18] Tr., p. 100.

[19] As testified by Darrin Lee, the Company proceeded by measuring credit hours per reserve paid in excess of guarantee and arriving at an average by which a reserve pilots breaks guarantee. (Tr., p. 98.)

uncertain. Under the circumstances, it is appropriate to resolve these uncertainties against the party responsible for the breach in the first place. The Board has done this by its conclusion that, while the Company's overall damage assessment model is the more reasonable of the two, the uncertainties as to extra costs incurred by pilots breaking guarantee should be resolved by assessing damages in the amount of $999,250 inclusive of applicable pension contributions.

There remains the question of how, particularly in light of the uncertainties discussed above, assessed damages should be distributed. Recognizing that achieving absolute precision is unattainable, the Board orders that the monies be distributed in seniority order at the domicile, equipment and seat where the violations occurred. Awards to individual reserve pilots shall account for, and be reduced by, hours actually flown by the reserve pilot. By this procedure, affected reserve pilots shall receive sums that, including applicable pension contributions, will account for the difference between the credited hours actually paid to affected reserves in the violation months and the average credited hours paid to lineholders at the particular location. The sums will be allocated to individual affected reserve pilots pursuant to a list provided by the Association to the Company, consistent with this award. Such list will contain an individual dollar amount for each affected reserve pilot with pension contributions inclusive, but noted separately.

The Company is ordered to cease and desist in the practice leading to this violation. As such, calculations must be made on a monthly, rather than on a rolling twelve month, basis so as to generate minimum utilizations of not less than the undisputed levels of 9.87 hours per day under the West contract and 8.79 hours per day under the East contract.

## AWARD

The grievance is granted in accordance with the observations made above.

*[signature]*

Richard I. Bloch, Chair
On Behalf of the System Board of Adjustment

May 30, 2012